IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Michael W.,[1]

        Plaintiff,

        v.

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____

Civ. No. 3:19-cv-1658-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiff brings this action for judicial review of the Commissioner's decision denying his application for a period of disability and disability insurance benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

On August 6, 2016, Plaintiff filed an application for benefits, alleging disability as of May 1, 2001. Tr. 13.[2] Following a September 18, 2018 hearing, the administrative law judge (ALJ) determined Plaintiff was not disabled under the Social Security Act.[3] Tr. 13-26. Plaintiff argues the ALJ erred in finding him less-than fully credible, in giving great weight to the opinions of the agency reviewing physicians, and in rejecting lay witness evidence provided by Plaintiff's wife. Because the Commissioner's decision is based on proper legal standards and supported by substantial evidence, the Commissioner's decision is AFFIRMED.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.

[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

[3] At the hearing, the ALJ allowed Plaintiff to amend the alleged onset date to October 31, 2013. Tr. 38.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id*. If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant

numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

The ALJ determined Plaintiff had the following severe impairments: degenerative disc disease spine, obesity, posttraumatic stress disorder (PTSD), and anxiety. Tr. 16. The ALJ concluded Plaintiff had the RFC to perform light work with the following relevant limitations: that he could stand and walk four of eight hours; could occasionally climb, stoop, crouch, kneel, and crawl; and could perform entry-level work with short and simple instructions and only occasional interaction with the public. Tr. 19. Plaintiff argues the ALJ erred in not capturing the full extent of his limitations. The Court disagrees.

1. **The ALJ's Weighing of the Medical Opinions**

Plaintiff argues the ALJ erred in giving great weight to the state reviewing psychiatrists regarding Plaintiff's mental capabilities. Pl.'s Br. 20; ECF No. 11. Specifically, Plaintiff argues:

> [The reviewing psychologists'] findings are not supported by the record and the ALJ provides great weight to their limitations nonetheless. Both find that [Plaintiff] is capable of performing short, simple, repetitive tasks and instructions. Tr. 23. However, [Plaintiff] clearly failed this test when he was asked to do so by an examining consultative examiner. Tr. 388-89. The ALJ did not provide clear and convincing evidence why he would defer to the state examiners' limitations when a consultative exam that was performed in-person found that [Plaintiff] was not capable of following a simple three step instruction set.

*Id.* at 21.

In essence, Plaintiff argues the ALJ should have given more weight to the findings of Tatsuro Ogisu, M.D., who conducted a comprehensive neurological examination of Plaintiff on April 11, 2017. *See* Pl.'s Reply, 6-7 ("In sum, [Plaintiff's] basic neurological testing was objectively riddled with errors and behavioral problems, yet the ALJ improperly relied on the findings of the state examiners who found that [Plaintiff] could work with others and perform

simple repetitive tasks only because Dr. Ogisu was not asked to look into these functional

limitations."). The Court disagrees.

In reviewing the record-as-a-whole, the ALJ concluded Plaintiff was limited to

performing entry-level work with short and simple instructions. Tr. 19. The ALJ devoted an

entire page of his order detailing the results of Dr. Ogisu's examination. Tr. 21-22. The ALJ

referenced Plaintiff's performance on cognitive testing during the examination:

> On cognitive tests, the claimant was able to correctly answer multiplication and
> addition problems; he could recall 3/3 items immediately, and 2/3 after a five-
> minute delay; and he was able to perform a three-step command. He was also
> fully oriented, responded to all questions, and he was able to follow all simple
> commands. Finally, Dr. Ogisu concluded the claimant's judgment was
> appropriate.

Tr. 21 (internal citations omitted).

Although Plaintiff focuses on the fact that he used the wrong hand at one point during the

examination, made errors in some serial seven progressions, and misspelled "world" when

attempting to spell it backward, the ALJ's summary is an accurate reflection of the examination.

Although Dr. Ogisu concluded Plaintiff suffered from "prominent" mental health issues that

likely impacted his short-term memory, Tr. 391, he also noted:

> Speech is normal. He is fully oriented and responds to all questions well, although
> his account of prior medical care may not be completely accurate. *He follows all
> simple commands well. During a three-step command he uses the right hand
> instead of the left one but otherwise follows through.* Serial sevens contain three
> errors in eight progressions. These are similar errors as in 93 to 87, 73-67, etc. He
> spells "world" forward correctly and requires a second attempt to spell it
> backward. He multiplies 9 by 8 and adds 42 and 39 without error. He repeats
> three out of three verbal items. Recall at five minutes is two out of three. He
> names the current president and the two preceding ones in order. Judgment
> appears to be appropriate based on the letter test. He is unable to interpret either
> of two given proverbs. His rendition of a clock showing the time 10 minutes until
> 11 o'clock is good.

Tr. 388-89.

4 – OPINION AND ORDER

Plaintiff's argument (1) ignores the fact that the ALJ limited Plaintiff to entry-level work with short and simple instructions; and (2) ignores the fact that Dr. Ogisu concluded that despite making some mistakes during the testing, Plaintiff "responds to questions well" and "follows all simple commands well." Tr. 388. Rather than ignoring the results of Dr. Ogisu's examination, the ALJ incorporated Dr. Ogisu's comments into Plaintiff's RFC.

The ALJ also noted treatment notes contained only intermittent references to Plaintiff's mental symptoms and that "[m]ental status examinations recite that he had a normal mood and affect; he was not nervous/anxious; his behavior was normal; and[] his judgment and thought content were normal." Tr. 22. These findings are supported by substantial evidence in the record. Treatment notes from July 2017 indicate that although Plaintiff was anxious, this was because Plaintiff had not smoked marijuana before the appointment.[4] Tr. 466. And although Plaintiff reported in a September 2015 therapy assessment that he suffered "symptoms of anxiety including; tension, heart racing, sick to stomach, clammy, shakiness in his hands and legs, worry, and emotionally worn down," the therapist noted Plaintiff's appearance, behavior, and interactions during the appointment were all "within reasonable range." Tr. 428. Similarly, Plaintiff's attention/concentration, thought processes, general knowledge, memory, insight, and judgement were intact and within normal range. Tr. 428-29. Numerous treatment notes from Plaintiff's primary care physician indicate Plaintiff had normal behavior, mood, judgment, and thought content. Tr. 477, 479, 481, 482-83, 484, 486.

Additionally, the ALJ "notes that the claimant reports using marijuana almost daily, which likely has a negative affect on his mental symptoms." Tr. 22. Although Plaintiff challenges this finding, it is supported by substantial evidence in the record. In May 2015,

---

[4] Although Plaintiff complained of increased mental symptoms, Plaintiff's therapist opined at this visit that Plaintiff's "intelligence and self-awareness" made him a good candidate for therapy. Tr. 466.

Plaintiff's primary care provider noted Plaintiff used marijuana "daily for [nightmares stemming from PTSD], and feels it helps to control his symptoms." Tr. 369. Although the provider recognized medical marijuana could be beneficial to some patients, "My medical advice was that he should abstain from drug use[.]" Tr. 371. In September 2015, a therapist noted Plaintiff "reports currently using Marijuana since 2007 and is using Marijuana everyday several times a day." In September 2016, Plaintiff's primary care provider noted "Currently using MJ to help with anxiety and pain symptoms with good relief." Tr. 359. The provider noted Plaintiff's scores on the drug screening form placed Plaintiff "into the risky zone of drug use, indicating use that increases the risk of health problems. We discussed this issue and my medical advice was that the patient should continue with counseling for anxiety symptoms and *use MJ as little as possible as it could be contributing to his lack of motivation for exercise and wt gain.* We explored the patient's reasons for using and motivation for changing. The patient agreed to plan above." Tr. 360.

The ALJ did not ignore the evidence in the record—in the form of treatment notes and Plaintiff's subjective reports—indicating Plaintiff had significant mental limitations. To the contrary, the ALJ concluded Plaintiff's PTSD and anxiety were severe impairments. The ALJ evaluated the entire record—which included the opinions of the reviewing physicians—and concluded that despite Plaintiff's limitations from PTSD and anxiety, he was capable of performing entry-level work with short and simple instructions.[5] Although Plaintiff argues another interpretation of the record is reasonable—i.e., that his mental limitations demonstrate he is disabled—that is not a legitimate reason for overturning the ALJ's conclusions. *See Gutierrez*, 740 F.3d at 523 ("If the evidence can reasonably support either affirming or reversing, 'the

---

[5] The ALJ also pointed out that Plaintiff home schools his 15-year-old daughter. Tr. 21. This finding provides additional support for the ALJ's conclusion that Plaintiff's mental limitations did not prevent him from doing entry-level work with short and simple instructions.

reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting

*Reddick*, 157 F.3d at 720-21)).

2. **The ALJ's Credibility Determination**

Plaintiff next argues the ALJ erred in finding him less-than fully credible as to the extent

of his limitations. The ALJ is not "required to believe every allegation of disabling pain, or else

disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. §

423(d)(5)(A)." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting *Fair v. Bowen*,

885 F.2d 597, 603 (9th Cir.1989)). The ALJ "may consider a wide range of factors in assessing

credibility." *Ghanim v. Colvin*, 12-35804, 2014 WL 4056530, at *7 (9th Cir. Aug. 18, 2014).

These factors can include "ordinary techniques of credibility evaluation," *id.*, as well as:

> (1) whether the claimant engages in daily activities inconsistent with the alleged
> symptoms; (2) whether the claimant takes medication or undergoes other
> treatment for the symptoms; (3) whether the claimant fails to follow, without
> adequate explanation, a prescribed course of treatment; and (4) whether the
> alleged symptoms are consistent with the medical evidence.

*Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir.2007).

Plaintiff alleged severe limitations, all stemming from a 2001 motor vehicle accident

resulting in the death of Plaintiff's friend.[6] In addition to chronic back pain, Plaintiff suffers from

PTSD. In a February 2017 function report, Plaintiff stated his conditions became severe enough

to keep him from working in January 2007.[7] Tr. 271. Plaintiff stated he was "unable to stand or

walk for more than 15-20 minutes due to pain and numbing in my left leg and hips." Tr. 287. "I

have difficulty bending to put on socks and shoes." Tr. 289. Plaintiff could not do house or yard

---

[6] As noted by the ALJ, Plaintiff was released from the hospital a few hours after the accident. Tr. 21, 387. Although Plaintiff argues he lacked insurance, this does not mean it was unreasonable for the ALJ to conclude that the accident did not result in extensive bodily injury to Plaintiff.

[7] Despite alleging his conditions prevented him from working in 2007, Plaintiff worked full-time in several jobs for nearly seven years beyond that date. Plaintiff's last substantial gainful employment, in late 2013, was as a general manager at Subway. Tr. 41. His duties included "writing schedules, taking all the inventory, throwing freight, doing all the ordering, all the cash, all the banking, hiring, [and recommendation authority related to] firing." Tr. 41.

work because "I am unable to lift, bend, squat, or kneel. I cannot do repetitive motions or stand

for long periods." Tr. 290. Plaintiff stated he could walk 5-10 minutes before needing to rest for

15-20 minutes. Tr. 292. Plaintiff wrote, "Lift less than 15 lbs; no squatting, bending, or kneeling;

limited standing, walking, or sitting; issues with memory and following instructions; volatile."

Tr. 292. At the September 2018 hearing, Plaintiff described his night terrors:

> a night terror is where you get stuck between asleep and awake, and they can be
> brought on by stress and anxiety, and basically for me, I get stuck in between the
> sleep and awake and it's almost like this area of loud humming and I can't seem
> to get myself to wake up and it takes my wife usually—it's a pretty good jarring
> to get me to wake up from them, and I usually wake up covered in sweat and
> just—I do not have a good day afterwards.

Tr. 43.

Plaintiff explained that his symptoms were increasing in severity: "I've always had the

anxieties and the night terrors, but the spikes of depression up and down, and the memory loss

and stuff like that that I've been having trouble with is more this last six or seven years." Tr. 43-

44. Plaintiff described his anxiety: "Usually in a lot of body twitching and just unclear thought.

The anxiety, the higher it gets, the more of a complacent like mindset I have, and that's where

the depression seems to come in. It just kind of makes me foggy. Like it just gives me this off

feeling." Tr. 44.

Plaintiff explained that although he took care of his 9-month-old daughter, he received

help from his 15-year-old daughter who he homeschooled. Plaintiff explained his 15-year-old

daughter "is a big help with some of the like bending down and picking her up off the floor and

stuff like that when she's crawling around and playing, and she helps with like bath time because

I can't bend down and get the—you know, get down there on the tub and help her get clean." Tr.

51. Plaintiff spends most of his day on the couch, but that after "about an hour, I notice I have to

get up and move around a little bit." Tr. 51. Plaintiff tries to go on at least two walks per day,

each under one mile. Tr. 52. Upon returning from a walk, "I immediately have to sit down for about 10 or 15 minutes. I noticed that it's tight after I do sit down, but it's the only way to get the feeling back from the numbing." Tr. 52. Plaintiff does not nap during the day "because there's too many things going on." Tr. 52. Plaintiff stated he could make no twisting or up and down movements because "they really get the nerves in my left side going bad. . . . And so, if I make movements, I tend to be quick about them. These slow, repetitive with my arms, they don't feel very good at all."[8] Tr. 53.

The ALJ acknowledged Plaintiff was limited but concluded that despite those limitations, Plaintiff could stand and walk for a total of four hours each workday and occasionally climb, stoop, crouch, kneel, and crawl. Tr. 19-20. In making this determination, the ALJ concluded that Plaintiff's daily activities contrasted with his allegations of disabling pain. Specifically, the ALJ noted that the fact that Plaintiff cared for his nine-month-old daughter contrasted with his statements regarding his limitations. Additionally, the ALJ concluded that Plaintiff's statements concerning his limitations were "not entirely consistent with eh medical evidence and other evidence in the record[.]" Tr. 20. These findings are supported by substantial evidence.

Plaintiff argues that because he receives help in raising his nine-month-old daughter, the ALJ erred in pointing to that fact in finding him less-than fully credible as to his capabilities. Although Plaintiff testified to receiving help from his 15-year-old daughter, the record supports the ALJ's determination that Plaintiff was more active in raising his infant baby. For example, May 30, 2018 treatment notes state, "Client reported his 15 year old step daughter has come to live with them." Tr. 446. Over two months earlier, the notes provide "Client forgot about appointment because his wife has started a new job and he is taking care of their baby full time."

---

[8] Despite alleging back paint prevented him from making any twisting movements, 2016 treatment notes indicate Plaintiff "has been trying to golf some to get out of the house[.]" Tr. 363. Plaintiff rode in a cart because walking would exacerbate his symptoms.

Tr. 449. Notes from January 31, 2018 indicate "Client has newborn baby at home and is not able to drive himself." Tr. 452. Given Plaintiff's alleged restrictions—"I am unable to lift, bend, squat, or kneel," Tr. 289, and "I am unable to stand or walk for more than 15-20 minutes due to pain and numbing in my left leg and hips," Tr. 287—along with the fact that Plaintiff spent several months taking care of his newborn daughter, the ALJ did not err in contrasting Plaintiff's daily activities against his alleged limitations.[9]

The ALJ concluded the medical evidence does not support the severity of Plaintiff's alleged limitations. This too is supported by the record. Plaintiff's doctors recommended conservative treatment, such as yoga and exercise, to relieve Plaintiff's pain. Tr. 364-65, 479. Later visits indicated Plaintiff was not following through with yoga or walking as advised in the earlier visit. Tr. 363. Plaintiff's December 2017 MRI revealed "1. L5-S1 minimal spondylolisthesis. No significant central canal stenosis. 2. L5-S1 mild-moderate bilateral foraminal stenosis. 3. Otherwise, essentially normal examination for age." Tr. 504. Although Plaintiff's doctor "Discussed with patient that we could get him set up with a back specialist for evaluation for possible injections or evaluation for other therapy to treat his pain issues for his neck and back," Tr. 506, the record does not indicate Plaintiff pursued additional treatments.

In September 2016, Plaintiff's doctor noted Plaintiff "Plans to get a treadmill so he can walk a 5k every day at home. Considering getting a bike to make use of the Veronia bike trail." Tr. 359. Plaintiff reported marijuana provided "good relief" for his pain symptoms. Tr. 359. In August 2015, Plaintiff reported his back pain "symptoms are able to be resolved with change in position and avoiding sitting on hard surfaces. Tr. 364. In April 2017, Plaintiff reported he obtained relief from pain "from stretching the left leg in front of him, taking a hot bath, and

---

[9] As noted above, that Plaintiff home schooled his daughter is inconsistent with his claim that he is incapable of following short and simple instructions.

smoking marijuana." Tr. 387. The ALJ did not err in noting the conservative treatment was inconsistent with Plaintiff's alleged limitations.

Additionally, the ALJ did not err in assigning weight to the only non-reviewing physician opinion in the record. After a comprehensive neurological examination, Dr. Ogisu opined Plaintiff could sit up to six hours in a normal workday, stand and walk combined up to half the time, lift 25 pounds occasionally and 10 pounds frequently, and had no restrictions in handling or reaching. Tr. 391. Dr. Ogisu offered this opinion based on the results of the examination, despite noting that the limitations contrasted with Plaintiff's stated limitations. The ALJ provided specific and legitimate reasons, supported by substantial evidence in the record in giving Dr. Ogisu's opinion some weight.[10]

To summarize, the ALJ did not err in utilizing "ordinary techniques of credibility evaluation" in weighing the validity of Plaintiff's self-reported limitations. *Ghanim*, 763 F.3d at 1163; *Lingenfelter*, 504 F.3d at 1040. Although Plaintiff argues another interpretation of the record is reasonable, that is not a legitimate reason for overturning the ALJ's conclusions. *See Gutierrez*, 740 F.3d at 523 ("If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting *Reddick*, 157 F.3d at 720-21)). Because the ALJ provided "specific, clear and convincing reasons" for finding Plaintiff less-than credible regarding the extent of his limitations, the ALJ did not err in giving little weight to Plaintiff's testimony regarding those limitations. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Smolen v. Chater*, 80 F.3d 1273,1282 (9th Cir. 1996)).

---

[10] The ALJ noted that Plaintiff's condition had "slightly worsened" since Dr. Ogisu's evaluation and therefore limited Plaintiff to only four hours of standing/walking with additional postural limitations beyond those recommended by Dr. Ogisuo. Tr. 22.

3. **Lay Witness Evidence**

Plaintiff's wife provided a third-party function report that largely mirrored Plaintiff's own allegations regarding his limitations. Because the ALJ's reasons for rejecting Plaintiff's testimony apply equally to the testimony of the third-party report, the ALJ did not err in giving little weight to the opinion of Plaintiff's wife. *Molina*, 674 F.3d at 1122.

## <u>CONCLUSION</u>

The ALJ's decision is free of legal error and supported by substantial evidence. The Commissioner's final decision is therefore AFFIRMED.

IT IS SO ORDERED.

DATED this 11th day of February, 2021.

_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge